United States District Court
Southern District of Texas
**ENTERED**
March 25, 2022
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RAYMOND PICKNEY and DAVID FREZEL, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. H-18-4545 |
| DIAMOND OFFSHORE SERVICES LIMITED, | § § § | |
| Defendant. | § § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs, Raymond Pickney ("Pickney") and David Frezel ("Frezel"), bring this action against defendant, Diamond Offshore Services Limited ("DOSL"), for engaging in employment discrimination in violation of 42 U.S.C. § 1981, and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 <u>et seq.</u> ("Title VII"). Pending before the court are Defendant [DOSL]'s Final Trial Plan & Objection to Plaintiffs' Initial Trial Plan (Docket Entry No. 192); Plaintiffs' Final Trial Plan; Objections to [DOSL]'s Final Trial Plan; and Response to [DOSL]'s Objections to Plaintiffs' Initial Trial Plan (Docket Entry No. 193); and Plaintiffs' Objections to Defendant's Second Amended Trial Exhibit List (Docket Entry No. 196). Also pending before the court is DOSL's request to exclude Plaintiffs' statistical evidence asserted in Defendant's Motion in Limine (Docket Entry No. 161),[1] which the

---

[1]Defendant's Memorandum in Support of Its Motion in Limine, Docket Entry No. 161-1, pp. 17-21 ¶ XIII. Page numbers for docket
(continued...)

court denied at Docket Call on October 8, 2021, stating that "I'll rule at trial after I determine what predicate has been laid to support the testimony."[2]  At a previous Docket Call held on June 11, 2021, the court denied Defendant's Motion to Exclude Report and Testimony of Plaintiff's Proposed Expert, N. Shirlene Pearson, Ph.D., stating

> I've read the motion, the response, and the reply.  I have some observations and then I'm going to rule.
>
> My normal practice is to rule on motions to exclude or to strike expert testimony during the trial because experts frequently modify their opinions.  And at trial, the party offering the expert may often establish a more extensive predicate for the expert's testimony. Moreover, the context in which the testimony is offered is often necessary for the Court to understand and rule effectively on the issues.
>
> However, in this case, because it looks like the expert's testimony was basically the primary evidence to support the plaintiff's case, I carefully reviewed the testimony under the prevailing Daubert standards.
>
> It is the Court's preliminary determination that Dr. Pearson is certainly qualified.  Her testimony would be relevant, assuming that the facts stated by plaintiffs are the correct facts; i.e., that there was one reduction in force covering a number of years.
>
> But in order for the Court to determine what the correct facts are, I have to hear evidence to determine whether the factual predicate for the expert's testimony are correct or not.  In other words, in order to determine whether the expert's opinions are reliable, I need to resolve fact issues that can only be resolved at trial.

---

[1](...continued)
entries in the record refer to the pagination inserted at the top of the page by the court's electronic filing system.

[2]Transcript of October 8, 2021, Docket Call, Docket Entry No. 181, pp. 4:10-12.

So, I'm going to deny the motion to strike the report and testimony of Dr. Pearson.

I am somewhat skeptical about whether there were one or more than one reductions in force. But we'll leave that for trial.[3]

This Memorandum Opinion and Order is intended to further address the admissibility of Dr. Pearson's report and testimony, and other issues of law and evidence raised in the parties' pretrial filings that will necessarily impact the amount of time that the court, the parties, and the witnesses will need for trial.[4] Other issues to be addressed include: (1) whether Plaintiff Pickney exhausted administrative remedies with respect to his Title VII disparate impact claim; (2) evidentiary matters pertaining to Plaintiffs' disparate treatment claims; and (3) a timing order for trial.[5]

---

[3]Transcript of June 11, 2021, Docket Call, Docket Entry No. 174, pp. 3:5-4:13.

[4]See Defendant Diamond Offshore Services Limited's Final Trial Plan & Objection to Plaintiffs' Initial Trial Plan, Docket Entry No. 192, p. 3 ("As stated in Diamond's Initial Trial Plan (Document No. 187) and further explained below, Diamond has two different time estimates at this stage — one estimate total 1275 minutes (21.25 hours), and the second estimate total 2140 minutes (35.6 hours). These different estimates derive, in large part, from the open question of whether Plaintiffs' 'single reduction-in-force theory' will be permitted at trial. . . . If that theory — which Diamond denies — were to be permitted, Diamond's total estimate of 2140 minutes (35.6 hours) applies; otherwise, Diamond's total estimate of 1275 minutes (21.25 hours) applies.").

[5]Joint Pre-Trial Order, Docket Entry No. 162, pp. 9-10.

## I.  **Factual and Procedural Background**[6]

Plaintiffs, Pickney and Frezel — both of whom are African-American — were employed by DOSL as Safety Department Representatives ("SDRs").  DOSL employed Pickney as a SDR from May 4, 1996, until May 6, 2016; and employed Frezel as a SDR from May 14, 2012, until August 12, 2015.  Plaintiffs contend that DOSL violated their rights under 42 U.S.C. § 1981 by discharging them because of their race — African-American — while retaining less tenured, less experienced, and lower-rated white SDRs as part of a single, continuing reduction-in-force ("RIF") that lasted for four years from 2014 through 2017.  Pickney also contends that DOSL violated his rights under Title VII by discharging him as a result of a neutral policy or practice that had a discriminatory impact on other African-American SDRs, and that DOSL violated his rights under 42 U.S.C. § 1981 and Title VII by failing to rehire him in retaliation for filing a complaint with the United States Equal Employment Opportunity Commission ("EEOC"), and for filing this lawsuit.  Plaintiffs contend that DOSL's racially biased actions have caused them substantial economic and non-economic damages.

DOSL denies that it discriminated against Plaintiffs because of their race in violation of either § 1981 or Title VII, and denies that it retaliated against Pickney for filing an EEOC charge or this lawsuit.  DOSL contends that the decline in oil prices

_____

[6]The factual background is based on the Statement of the Case in the Joint Pre-Trial Order, Docket Entry No. 162, pp. 2-4; Defendant's Memorandum of Law, Docket Entry No. 166; and Plaintiffs' Trial Memorandum, Docket Entry No. 167.

beginning in 2014 resulted in an unprecedented and prolonged economic downturn in the oil industry, which caused a downturn in its business and a reduction in the number of offshore oil rigs in operation. DOSL contends that the reduction in the number of offshore oil rigs in operation necessitated multiple reductions in offshore personnel over a six-year period, and that it discharged Frezel and Pickney in separate RIFs that occurred in in 2015 and 2016, respectively. DOSL contends that its RIFs were not based on race, and that many white and other non-African American SDRs were affected, including the white SDR who was assigned to the same rig as Pickney when his employment ended in May of 2016. DOSL contends that the economy-driven RIFs during which Plaintiffs were discharged are legitimate, nondiscriminatory reasons for these employment actions, and that consequently Plaintiffs are not entitled to any of the relief they are seeking in this lawsuit.

DOSL contends that Pickney's disparate impact claim is not actionable because he failed to exhaust his administrative remedies for this claim.

DOSL denies that it retaliated against Pickney for engaging in activity protected by 42 U.S.C. § 1981 or Title VII, and denies that it has any obligation to offer employment to any individual who does not actively seek or reapply for employment for an open position. DOSL contends that Pickney has failed to identify any specific open position for which he applied, was qualified, and denied, and that any staffing decision had nothing to do with his filing of an EEOC charge or this lawsuit.

## II. __Pickney Failed to Exhaust Administrative Remedies__ __for His Disparate Impact Claim__

DOSL has long argued that Pickney's disparate impact claim is barred for failure to exhaust administrative remedies.[7]  Pickney argues that he has exhausted administrative remedies with respect to his disparate impact claim.[8]  The Joint Pre-Trial Order states that this issue is a contested issue of law.[9]

---

[7]<u>See</u> Defendant's Motion to Strike Plaintiff's Ostensible First and Second Amended Complaints, and Authorities in Support, Docket Entry No. 26, pp. 1, 4-8; Defendants' Opposition to Plaintiff's Motion for Leave to File Third Amended Complaint, and Authorities in Support, Docket Entry No. 36 (reiterating arguments in Docket Entry No. 26); Defendants' Objections to Magistrate Judge's Order Granting Plaintiff's Motion for Leave to File Third Amended Complaint, Docket Entry No. 44, pp. 12-26; Defendants' Reply to Plaintiff's Response to Defendants' Objections to Magistrate Judge's Order, Docket Entry No. 47, pp. 2-8; Joint Pre-Trial Order, Docket Entry No. 162, pp. 6-7; Defendant's Memorandum of Law, Docket Entry No. 166, pp. 14-19.

[8]<u>See</u> Plaintiff's Reply to Diamond's Opposition to Plaintiff's Motion for Leave to File Third Amended Complaint, Docket Entry No. 37, pp. 2-14.  <u>See also</u> Transcript of April 22, 2019, Motion Hearing, Docket Entry No. 41, pp. 3:12-14:25.  Anticipating that Defendants' would assert this argument, Pickney preemptively asserted that "any such argument would <u>itself</u> be futile because Pickney[] is not **amending** his Complaint to assert a Title VII disparate impact claim: . . . Pickney's Original Complaint **already** includes such a claim." Plaintiff's Motion for Leave to File Third Amended Complaint, Docket Entry No. 32, p. 14. The court has reviewed the Original Complaint, Docket Entry No. 1, however, and concludes that it only  alleges a claim for disparate treatment. Plaintiffs' Trial Memorandum, Docket Entry No. 167, p. 12 n. 5, asserts that "the United States Magistrate Judge and this Court implicitly held in denying [DOSL's] Motion to Strike Plaintiffs' Third Amended Complaint (Dkt. 26), [that] Pickney exhausted his Title VII administrative remedies with respect to both disparate treatment **and** disparate impact race discrimination.  <u>See</u> Dkts. 39, 48."  But because the court's prior ruling merely granted the Plaintiffs' motion to file a Third Amended Complaint, it did not resolve the exhaustion issue regarding the disparate impact claim.

[9]<u>See</u> Joint Pre-Trial Order, Docket Entry No. 162, p. 9 (under
(continued...)

**A.   Applicable Law**

Unlike disparate treatment discrimination, which involves an employment action that intentionally treats an individual employee worse than other employees because of a protected characteristic, e.g., race; disparate impact discrimination involves an employment practice or policy that is facially neutral but, in fact, has a disproportionately adverse effect on a protected group.  Pacheco v. Mineta, 448 F.3d 783, 787 (5th Cir.), cert. denied, 127 S. Ct. 299 (2006).  A plaintiff alleging a claim for disparate impact "must show (1) a facially neutral policy; (2) that, in fact, has a disproportionately adverse effect on a protected class."  Id. at 791.  See also McClain v. Lufkin Industries, Inc., 519 F.3d 264, 275 (5th Cir.), cert. denied, 129 S. Ct. 198 (2008) (citing Watson v. Fort Worth Bank and Trust, 108 S. Ct. 2777, 2788 (1988)).  "A neutral employment policy is the cornerstone of any EEO[C] disparate-impact investigation, since the EEO[C] must evaluate both the policy's effects on protected classes and any business justifications for the policy."  Pacheco, 448 F.3d at 792.  A charge that complains of only past incidents of disparate treatment and does not identify a neutral employment policy does not exhaust a disparate impact claim.  Id.

------------------------------------------------------------

⁹(...continued)
heading "Contested Issues of Law" is "Whether Plaintiff Raymond Pickney exhausted administrative remedies with respect to his claim of disparate impact under Title VII of the Civil Rights Act").

Title VII precludes an employee from bringing a lawsuit against its employer without first exhausting the administrative remedies available.  McClain, 519 F.3d at 273.  To exhaust Title VII remedies, the plaintiff must: (1) file a discrimination charge with the EEOC; and (2) the EEOC must conclude their investigative efforts.  Id.  "The exhaustion requirement must be construed liberally to aid the unsophisticated pro se claimant."  Gordon v. Peters, 489 F.Supp.2d 729, 731 (S.D. Tex. 2007), aff'd No. 07-20477, 2008 WL 162866 (5th Cir. January 16, 2008) (citation omitted).  The charge need not be specific or establish a prima facie case.  Pacheco, 448 F.3d at 792.  Nonetheless, courts must keep in mind that one of Title VII's primary purposes is to trigger the investigatory and conciliatory process of the EEOC in an effort to achieve non-judicial resolution of employment discrimination claims.  Id. at 788-89.  Claims alleged in the charge, or those that could have reasonably grown out of the charge, will be considered exhausted.  Id. at 789.  In making the exhaustion determination, courts engage in a fact-intensive analysis and look beyond the four corners of the charging document.  McClain, 519 F.3d at 273 (citation omitted).  The scope of the EEOC investigation is pertinent to the court's exhaustion inquiry.  Id. at 274 (citation omitted).

-8-

**B.   Application of the Law to the Parties' Contentions**

In this case only an EEOC investigation into disparate treatment would have reasonably grown out of Pickney's EEOC charge. The charge of discrimination that Pickney filed on August 27, 2016, stated:

> I began my employment with the above Respondent in May 1996 most recently as Safety Dept. Representative. On May 6, 2016 I was subjected to a lay-off initially by Tim Gibson (Director of Safety) and later by Gaby Ortiz (Human Resources).   The company employees over 500 persons.
>
> According to Aaron Sobel (V.P. Human Resources) I could not be re-assigned because the operators who are our clients do no want them to change out any personnel and a change of personnel could upset our clients.
>
> I believe I have been discriminated against based on my race (Black) in violation of Title VII of the Civil Rights Act of 1964 as amended in that on May 16, 2016 I contacted Aaron Sobel about my lay off after 20 years with the company.  I stated that I had not been treated fairly in accordance with Diamond Equal Employment Opportunity Policy.  The next day Mr. Sobel stated that he reviewed the decision process that was used to determine my lay off and he agrees with it.  I was laid off while employees (w) [sic] with less experience were retained specifically Michael Mura.[10]

This charge is analogous to the charge at issue in Pacheco, 448 F.3d at 783.  In Pacheco the plaintiff complained of racial discrimination at work, and brought claims premised on disparate treatment and disparate impact theories.  448 F.3d at 786-87.  The Fifth Circuit affirmed the district court's dismissal of the

---

[10]Charge of Discrimination, Exhibit 1 to Defendant's Motion to Strike Plaintiff's Ostensible First and Second Amended Complaints, and Authorities in Support, Docket Entry No. 26-1, p. 1.

plaintiff's disparate impact claim after finding that a disparate impact investigation could not have reasonably grown from the plaintiff's charge because: (1) the charge facially alleged disparate treatment; (2) the charge failed to identify a neutral employment policy; and (3) the charge alleged only past incidents of disparate treatment. Id. at 792.

Applying the Pacheco reasoning to the present case yields the same result. Here, as in Pacheco, Pickney's charge facially alleges only disparate treatment, i.e., Pickney alleges that he was laid off while employees with less experience were retained. More importantly, although Pickney states that he was not treated fairly in accordance with Defendant's Equal Employment Opportunity Policy, Pickney fails to identify, either directly or indirectly, a neutral employment policy that had a disproportionate impact on other African-Americans as opposed to on him individually. See McClain, 519 F.3d at 275 (finding allegation that "[r]espondent has similarly discriminated against other black African Americans" satisfied the exhaustion requirement). Accordingly, a disparate impact investigation could not have reasonably been expected to grow out of Pickney's charge.

Nevertheless, citing Federal Express Corp. v. Holowecki, 128 S. Ct. 1147 (2008), and Patton v. Jacobs Engineering Group, Inc., 874 F.3d 437 (5th Cir. 2017), Pickney argues that when deciding whether he exhausted administrative remedies for a disparate impact

claim, the court should consider not only the charge of discrimination that he filed on August 27, 2016, but also the unsworn pre-charge email that he submitted to the EEOC on August 2, 2016, which he argues constitutes part of his charge.[11]  Moreover, citing the position statement that Defendants submitted to the EEOC on October 21, 2016, which defended their RIF decision-making process as legal, and the response that he submitted the same day, Pickney also argues that the scope of the EEOC's investigation encompassed disparate impact.[12]

In certain circumstances, courts have considered other documents as part of a formal EEOC charge.  In Holowecki, 128 S. Ct. at 1163, the Supreme Court found that a detailed and verified intake questionnaire constituted a charge under the ADEA because it contained all of the necessary information on an EEOC charge form, it was sworn, and it asked the EEOC to take action.  In Patton, 874 F.3d at 443, the Fifth Circuit found that the plaintiff's "intake questionnaire should be construed as part of the EEOC charge" because it was filed "together with his formal charge," the charge form directed complainants to "attach extra sheet(s) . . . [i]f

---

[11]See Plaintiff's Response to Diamond's Objections to Magistrate Judge Johnson's Order Regarding Plaintiff's Motion for Leave to File Third Amended Complaint, Docket Entry No. 45, p. 24 n. 4 (arguing that "under Holowecki and Patton, Pickney's August 2, 2016 email — which he submitted in response to the EEOC's express request for information to 'assist [the EEOC] in completing the Charge' — must be considered part of his Charge").

[12]Id. at 25-26.

additional paper is needed," and the EEOC investigation "clearly encompassed" the claim at issue.  However, this is not always the case.  In <u>Ernst v. Methodist Hospital System</u>, 1 F.4th 333, 338 (5th Cir. 2021), the plaintiff alleged only race discrimination in his EEOC charge, but included additional allegations of sex discrimination and retaliation in his EEOC intake questionnaire. The Fifth Circuit held that the plaintiff failed to exhaust his administrative remedies with respect to the allegations of sex discrimination and retaliation because the questionnaire was not verified and because plaintiff's employer did not receive notice of the additional allegations during the EEOC investigation.  <u>Id.</u> at 339.  The court reached a similar conclusion in <u>McLeod v. Floor & Decor Outlets of America, Inc.</u>, No. 3:20-cv-3134-E, 2021 WL 2515750 (N.D. Tex. June 18, 2021).  In <u>McLeod</u>, more than three (3) weeks before filing a formal EEOC Charge of Discrimination, the plaintiff filled out an online inquiry information form with the EEOC, which was neither sworn nor supported by an unsworn declaration. Although the inquiry form mentioned retaliation and sex discrimination, because the EEOC Charge alleged only sex discrimination, the court held "that McLeod's unverified inquiry information form does not qualify as a charge and thus McLeod has failed to exhaust her administrative remedies regarding her Title VII retaliation claim."  <u>Id.</u> at *2.

Here, Pickney did not submit an EEOC intake questionnaire, and his August 2, 2016, pre-charge email to the EEOC was neither sworn nor attached to his sworn charge.[13]  Thus, the August 2, 2016, email cannot be considered either a charge of discrimination under Holowecki or a part of Pickney's charge under Patton.  Moreover, even if the August 2, 2016, email were considered to be a part of Pickney's charge, that email fails to allege any facts that could reasonably be expected to have triggered an investigation of a neutral policy that had a disparate impact on African-Americans, thereby exhausting administrative remedies with respect to a disparate impact claim.  Instead, the email described when and how Pickney learned that he would be discharged, his request to be reassigned to another rig, and the reason he was told for why he would not be reassigned to another rig.  The email also listed "all [SDRs] like [Pickney] who were working on rigs which the job ended and were granted the opportunity to be re-assigned to another vessel compared to [Pickney] who was laid off."[14]  The facts stated in the August 2, 2016, email would and did lead to an investigation of disparate treatment, but could not reasonably have been expected to trigger an investigation of disparate impact.

_____

[13]See Exhibit 2 to Declaration of Raymond Pickney, Docket Entry No. 45-1, pp. 8-11.

[14]Id. at 10.

-13-

Moreover, despite Pickney's argument to the contrary, he has failed to cite evidence showing that the scope of the EEOC's investigation that grew out of his charge actually encompassed race-based disparate impact discrimination. Pickney argues that

> [t]hroughout its "position statement," Diamond repeatedly attempted to defend its purportedly neutral RIF decision-making "policy" as "lawful." Specifically, Diamond asserted:
>
>> It is not Company policy to displace employees on other operational rigs to create openings for employees assigned to rigs with expired contracts. . .
>>
>> As noted above, it is not Company policy to displace employees on other operational rights to create openings for employees assigned to rights with expired contracts. This policy is lawful . . .
>>
>> [I]t is not Company policy to displace employees on other operational rigs to create openings for employees assigned to rigs with expired contracts.
>>
>> . . .
>
> Diamond's extensive effort in its EEOC "position statement" to defend its purportedly neutral RIF decision-making "policy" as "lawful" constitutes evidence that the scope of Pickney's Charge encompassed a claim for Title VII disparate impact discrimination. <u>See Patton</u>, 874 F.3d at 425 (5th Cir. 2017) (Plaintiff exhausted administrative remedies regarding his ADA reasonable accommodation claim, where the employer's position statement denied that the plaintiff made any request for reasonable accommodation and responded to a question regarding reasonable accommodation).
>
> Furthermore, in its October 21, 2016 EEOC "position statement," Diamond — through its counsel — denied that its RIF "was conducted . . . in a discriminatory manner." . . . Diamond's contention that its RIF was not conducted in "a discriminatory manner" — which Diamond

differentiated from "discriminatory intent" (i.e., disparate treatment) — demonstrates that it understood that Pickney's Charge encompassed a claim for disparate impact discrimination.[15]

Pickney also argues that

[i]n his rebuttal to Diamond's "position statement," Pickney once again identified Diamond's purportedly neutral decision-making policy that caused his termination: namely, that Diamond laid-off [SDRs] when the vessel/rig to which they were assigned ceased operations because its contract ended. Additionally, Pickney identified one other African-American employee (Wayne Johnson) who was terminated during the RIF.[16]

Pickney does not cite and the court has not found any case holding that a respondent's use of the phrase "discriminatory manner" is sufficient to exhaust a claim for disparate impact in a case such as this where the charge alleges only disparate treatment involving a single complainant. Nor has Pickney cited any evidence showing that the EEOC actually investigated a claim of disparate impact in this case. Because Pickney did not complain of disparate impact in his charge of discrimination, because the communications that Pickney sent to the EEOC on August 2, 2016, and October 21, 2016, cannot be considered part of his charge, and because Pickney does not cite evidence showing that the EEOC investigated a

---

[15]Plaintiff's Response to Defendant's Objections, Docket Entry No. 45, pp. 26-27 (quoting Defendants' October 21, 2016, Position Statement to the EEOC, Exhibit 4 to Pickney Declaration, Docket Entry No. 45-1, pp. 15-19, esp. pp. 16-18).

[16]Id. at 27 (citing Exhibit 5 to Pickney Declaration, Docket Entry No. 45-1, pp. 21-22).

disparate impact claim in his case, Pickney failed to exhaust his administrative remedies with respect to disparate impact.  <u>See</u> <u>McClain</u>, 519 F.3d at 273 ("Courts should not condone lawsuits that exceed the scope of EEOC exhaustion, because doing so would thwart the administrative process and peremptorily substitute litigation for conciliation.").  Accordingly, Pickney's disparate impact claim should be dismissed without prejudice.  <u>See</u> <u>Martin K. Eby</u> <u>Construction Co., Inc. v. Dallas Area Rapid Transit</u>, 369 F.3d 464, 467, n. 5 (5th Cir. 2004) ("When a district court dismisses a claim . . . for failure to exhaust administrative remedies, the dismissal is without prejudice to the claimant's right to return to court after it has exhausted its administrative remedies.").

### III.  <u>Plaintiffs' Disparate Treatment Claims</u>

Both Plaintiffs assert claims of race-based disparate treatment under 42 U.S.C. § 1981, and Pickney has also asserted a claim of race-based disparate treatment under Title VII.[17] Plaintiffs contend that they were both discharged during a single, continuing RIF while less qualified white SDRs were retained.[18]

---

[17]Joint Pre-Trial Order, Docket Entry No. 162, pp. 1-2.

[18]<u>Id.</u> at 5; Plaintiffs' Trial Memorandum, Docket Entry No. 167, pp. 7-8.

## A.    Applicable Law

"Claims of racial discrimination brought under § 1981 are governed by the same evidentiary framework applicable to claims of employment discrimination brought under Title VII." LaPierre v. Benson Nissan, Inc., 86 F.3d 444, 448 n. 2 (5th Cir. 1996).  The evidentiary framework for Title VII claims was established by the Supreme Court in McDonnell Douglas Corp. v. Green, 93 S. Ct. 1817 (1973).  Within that framework plaintiffs bear the initial burden of proving a prima facie case of discrimination.  Id. at 1824.

> To establish a prima facie case of intentional discrimination in a reduction-in-force case, a plaintiff must establish the following elements: (1) he is a member of a protected group; (2) he was adversely affected by the employer's decision; (3) he was qualified to assume another position at the time of discharge; and (4) there is sufficient evidence, either circumstantial or direct, from which a fact finder may reasonably conclude that the employer intended to discriminate in reaching the adverse employment action, or others who were not members of the protected class remained in similar positions.

Ortiz v. Shaw Group, Inc., 250 F. App'x 603, 606 (5th Cir. 2007) (per curiam) (quoting Nichols v. Loral Vought Systems Corp., 81 F.3d 38, 41 (5th Cir. 1996) and Amburgey v. Corhart Refractories Corp., Inc., 936 F.2d 805, 812 (5th Cir. 1991)).

> If the plaintiff successfully establishes his prima facie case and creates a rebuttable presumption of discrimination, then the employer must assert a legitimate, nondiscriminatory reason for the employment action.

Id. (citing Bauer v. Albemarle Corp., 169 F.3d 962, 966 (5th Cir. 1999)).

-17-

> Once an employer satisfies its burden, the presumption of discrimination falls aside, and the plaintiff must create an issue of fact "either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motive alternative)." . . . If the plaintiff shows that the illegal discrimination was a motivating factor, then the defendant may respond with evidence that the same employment decision would have occurred regardless of discriminatory animus.

Id. (quoting Rachid v. Jack In The Box, Inc., 376 F.3d 305, 312 (5th Cir. 2004)).

Acknowledging that this is the framework for establishing discrimination in a RIF case, Plaintiffs state that

> Pickney will establish a prima facie case of racially disparate treatment under Title VII: 1) he is a member of a protected group (African-American); 2) Diamond terminated him; 3) he was a highly qualified SDR; and 4) Diamond retained white SDR[]s after terminating him.
>
> Diamond will argue that it had a legitimate, non-discriminatory reason for terminating Frezel, Pickney, and the other four African-American SDR[s].
>
> . . . Pickney will establish that Diamond's proffered reason is a pretext or "mixed motive" for race discrimination.[19]

Although at trial the ultimate question will be whether the Defendant took the adverse employment actions at issue because of the Plaintiffs' protected status, because the McDonnell Douglas burden-shifting framework applies in summary judgment and directed verdict situations, see Kanida v. Gulf Coast Medical Personal LP, 363 F.3d 568, 575 (5th Cir. 2004), that framework guides the court's resolution of the parties' evidentiary disputes.

---

[19]Plaintiffs' Trial Memorandum, Docket Entry No. 167, p. 13.

**B.    Application of the Law to the Parties Contentions**

1.    <u>Plaintiffs May Present Evidence Intended to Prove that
They were Discharged in a Single, Continuing RIF</u>

Plaintiffs contend that they were discharged along with DOSL's four other African-American SDRs during a single, continuing RIF that transpired between 2014 and 2017. Plaintiffs contend that while DOSL discharged one-hundred percent of its African-American SDRs during this period, DOSL discharged only twenty-six percent of its white SDRs,[20] and that "[t]his gross racial statistical disparity is no accident: it resulted from [DOSL]'s top Safety and Human Resources' officials' disparate treatment of its African-American SDRs."[21]

DOSL denies Plaintiffs' claims of race discrimination, and contends that it discharged Pickney and Frezel in different RIFs that occurred approximately one year apart that were necessitated by an unprecedented downturn in the oil industry that began in 2014.[22] Characterizing Plaintiffs' theory of a single, continuing RIF as a "fallacy," DOSL contends that over the course of an approximately six-year period it conducted multiple RIFs of SDRs, <u>i.e.</u>, each time that one of its oil rigs lost its contract. DOSL

---

[20]Plaintiffs' Trial Memorandum, Docket Entry No. 167, p. 1.

[21]<u>Id.</u> at 2.   <u>See also</u> Joint Pre-Trial Order, Docket Entry No. 162, pp. 8 (Pickney) and 9 (Frezel).

[22]<u>See</u> Joint Pre-Trial Order, Docket Entry No. 162, pp. 3, 6.

contends that the Plaintiffs were discharged in RIFs that occurred in 2015 and 2016, those RIFs were legitimate, non-discriminatory reasons for discharging the plaintiffs, and the discharge decisions had nothing to do with Plaintiffs' race.[23]

The concept of a continuing RIF is recognized in Fifth Circuit case law cited by Plaintiffs and elsewhere.  See Rhodes v. Guiberson Oil Tools, 39 F.3d 537, (5th Cir. 1994) (referencing a "continuing reduction-in-force (RIF)" pursuant to which layoffs occurred in 1984, 1985, and 1986), rev'd, 75 F.3d 989 (5th Cir. 1996)(en banc); Zuniga v. Boeing co., 133 F. App'x 570, 580 (10th Cir. 2005), cert. denied, 126 S. Ct. 1051 (2006) ("The employees were all terminated or selected for the RIF within a year as part of a continuing RIF; . . ."). See also Garig v. N.L. Industries, Inc., 671 F.Supp. 1460, 1461 (S.D. Tex. 1985), aff'd 792 F.2d 1120 (5th Cir. 1986) ("The defendant is an oil service company.  In

---

[23]See Defendant's Motion to Exclude Report and Testimony of Plaintiffs' Proposed Expert, N. Shirlene Pearson, Ph.D. ("DOSL's Motion to Exclude"), Docket Entry No. 143, pp. 7, 13-21; Defendant's Reply to Plaintiffs' Response to Diamond Offshore Services Limited's Motion to Exclude Report and Testimony of N. Shirlene Pearson, Ph.D. ("Defendant's Reply in Support of Motion to Exclude Pearson"), Docket Entry No.150, pp. 7-14; Defendant's Memorandum of Law, Docket Entry No. 166, p. 3.   See also Defendants' Opposition to Plaintiffs' First Motion to Compel, Docket Entry No. 29, p. 4 (contending that "there were multiple independent RIFs during the five-year period from 2014-2019, including separate reductions every time a different operating rig went off contract and stopped working;" and that "this case arises out of a single RIF on a single rig affecting only two Safety Representatives").

1982, it began to feel the effects of a general downturn in the oil industry.  Responding to economic pressure, the defendant began a reduction in force that was continuing at the time of trial.").

Neither party has cited — and the court has not found — any case that addresses and resolves the specific conflict at issue here, i.e., whether the plaintiffs were discharged during a single, continuing RIF that lasted for a number of years as Plaintiffs argue; or whether the plaintiffs were discharged in separate, distinct RIFs that occurred when each of the oil rigs to which they were assigned lost their contracts and were taken out of service, as DOSL argues.  The pretrial materials identify this issue as both a contested issue of fact and a contested issue of law.[24]  The court views this issue as a mixed question of law and fact.[25]  Accordingly, Plaintiffs will be allowed to present evidence capable of proving their theory that they were discharged as part of a single, continuing RIF.

---

[24]See Joint Pre-Trial Order, Docket Entry No. 162, p. 8 (under the heading "Contested Issues of Fact" is "Whether DOSL terminated Plaintiff Raymond Pickney as part of a single, continuing [RIF]"); p. 9 ("Whether DOSL terminated Plaintiff David Frezel as part of a single, continuing [RIF]; and under the heading "Contested Issues of Law" is "Whether DOSL terminated Plaintiff Raymond Pickney as part of single, continuing [RIF]"); and p. 11 (also under the heading "Contested Issues of Law" is "Whether DOSL terminated Plaintiff David Frezel as part of a single, continuing [RIF]").

[25]See Transcript of June 11, 2021, Docket Call, Docket Entry No. 174, pp. 3:21-4:13.

2.   <u>Plaintiffs May Present Evidence Intended to Prove That</u>
<u>They Are Similarly Situated to DOSL's Other SDRs</u>

Defendant seeks to exclude "evidence of any kind regarding other SDRs who are not similarly situated to either Plaintiff."[26] At Docket Call held on October 8, 2021, the court denied this request as "too broad."[27]   Plaintiffs seek to compare themselves both to DOSL's other African-American SDRs, who Plaintiffs allege were all discriminatorily discharged in a single, continuing RIF, and to white SDRs, who Plaintiffs allege were treated more favorably in the RIF.[28]   DOSL contends that Plaintiffs were similarly situated with — and can only be compared to — SDRs who worked on the same oil rig as Plaintiffs when the Plaintiffs were

---

[26]Defendant's Memorandum in Support of Its Motion in Limine, Docket Entry No. 161-1, p. 25 ¶ XVII.

[27]Transcript of October 8, 2021, Docket Call, Docket Entry No. 181, p. 4:22-23.

[28]<u>See</u> Plaintiffs' Trial Memorandum, Docket Entry No. 167, pp. 3-6.   <u>See also</u> Joint Pre-Trial Order, Docket Entry No. 162, p. 10 (under the heading "Contested Issues of Law" is "Whether, for the purpose of Plaintiff Raymond Pickney's disparate treatment . . . claim[], he is similarly situated to and can compare himself to SDRs with varying qualifications and credentials, who worked on different rigs for different companies at different times in different locations around the world, including those whose employment was terminated due to different reductions in force occurring at different times since 2014."), and pp. 11-12 (posing the same question with respect to Plaintiff Frezel); and Plaintiffs' Final Trial Plan; Objections to [DOSL]'s Final Trial Plan; and Response to [DOSL]'s Objections to Plaintiffs' Initial Trial Plan, Docket Entry No. 193, p. 8 (arguing that "Mssrs. Bellow, May, Thomas, and Thompson **are** similarly situated to the Plaintiffs — having held the same position and having been supervised and terminated by [DOSL's] HSE department.  Therefore, Plaintiffs should be allowed to adduce their testimony.").

discharged.[29]  DOSL cites a number of cases, which it argues show that the Fifth Circuit and other courts have rejected similar efforts of plaintiffs to compare themselves to others who were not affected by the same RIF, who worked on different rigs, or who otherwise were not similarly situated.[30]  See e.g., Gilbert v. Big Brothers Big Sisters of America, Inc., 262 F. Supp. 3d 402, 408-09, 414-15 (N.D. Tex. 2017) (cited for rejecting plaintiff's effort to use statistical data from RIFs that did not involve her and that were separate from the decision to eliminate her position, nothwithstanding that all the terminations were due to the company's dire financial situation); Ellison v. Patterson-UTI Drilling Co., LLC, Civil Action No. V-08-67, 2009 WL 3247193, *9 (S.D. Tex. September 23, 2009) (cited for holding as too broad, plaintiff's request for discovery of all discrimination charges on all rigs, and for concluding that "if employment decisions are made by one office for the entire company, the request is limited to complaints involving rigs where Plaintiff worked"); and Lee v. Kansas City Southern Railway Co., 574 F.3d 253, 259 (5th Cir. 2009)

---

[29]See Defendant's Memorandum of Law, Docket Entry No. 166, pp. 7-8 (arguing that Plaintiffs can only compare themselves to SDRs who are similarly situated or proper comparators for their race discrimination claims). See also Defendants' Opposition to Plaintiffs' First Motion to Compel, Docket Entry No. 29, p. 3 ("Only Safety Representatives on the Ocean Ambassador at the time of the RIF at issue are proper comparators and relevant for discovery in this case.").

[30]See Defendants' Opposition to Plaintiffs' First Motion to Compel, Docket Entry No. 29, pp. 4-5.

(cited for its statement that employees "who were the subject of adverse actions too remote in time from that taken against the plaintiff generally will not be deemed similarly situated").

In <u>Lee</u> the Fifth Circuit stated that

> we require that an employee who proffers a fellow employee as a comparator demonstrate that the employment actions at issue were taken "under nearly identical circumstances." The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories. And, critically, the plaintiff's conduct that drew the adverse employment decision must have been "nearly identical" to that of the proffered comparator who allegedly drew dissimilar employment decisions.

<u>Id.</u> at 260 (quoting <u>Little v. Republic Refining Co., Ltd.</u>, 924 F.2d 93, 97 (5th Cir. 1991)). <u>See also</u> <u>Shackelford v. Deloitte & Touche, LLP</u>, 190 F.3d 398, 405-06 (5th Cir. 1999) (holding that similarly situated means employees with the same position, qualifications, and pay rate). Although the pretrial materials identify this issue as a question of law,[31] the court views this issue as a mixed question of law and fact. Because the cases that

---

[31]<u>See</u> Joint Pre-Trial Order, Docket Entry No. 162, p. 10 (under the heading "Contested Issues of Law" is "Whether, for the purpose of Plaintiff Raymond Pickney's disparate treatment . . . claim[], he is similarly situated to and can compare himself to SDRs with varying qualifications and credentials, who worked on different rigs for different companies at different times in different locations around the world, including those whose employment was terminated at different times in different locations around the world . . ."), and pp. 11-12 (posing the same question with respect to Plaintiff Frezel).

DOSL cites in support of its contention that Plaintiffs are only similarly situated to SDRs who were assigned to the same rigs and discharged at the same time turn on unique facts, these cases support the court's conclusion that whether Plaintiffs are similarly situated to DOSL's other SDRs is a mixed question of law and fact. Accordingly, Plaintiffs may present evidence intended to prove that they are similarly situated under the criteria described above, both to other African-American SDRs, who they contend were discharged in the same, continuing RIF, and to other white SDRs, who they contend were retained.

3.    <u>Plaintiffs May Present "Me-Too" Evidence Only If They First Prove that They are Similarly Situated to Their "Me-Too" Witnesses</u>

Defendants seek to exclude "me-too" testimony from the other four African-American SDRs, who Plaintiffs contend DOSL discharged during the alleged single, continuing RIF,[32] <u>i.e.</u>, Allen Below, Otis Thompson, Brandon Thomas, and Douglas Tyrone May, all of whom appear as witnesses in Plaintiffs' Final Trial Plan.[33]  DOSL argues

---

[32]<u>See</u> Defendant [DOSL]'s Final Trial Plan & Objections to Plaintiffs' Initial Trial Plan, Docket Entry No. 192, pp. 1-2.  <u>See also</u> Defendants' Memorandum in Support of Its Motion in Limine, Docket Entry No. 161-1, pp. 23-24 ¶ XVI; and Defendant's Memorandum of Law, Docket Entry No. 166, pp. 9-10 (arguing that "Plaintiffs [c]an [o]nly [c]ompare [t]hemselves to SDRs [w]ho [a]re [s]imilarly [s]ituated or [p]roper [c]omparators for their [r]ace [d]iscrimination [c]laims").

[33]<u>See</u> Plaintiffs' Initial Trial Plan, Docket Entry No. 188, pp. 2-3; and Plaintiffs' Final Trial Plan; Objections to [DOSL]'s Final Trial Plan, and Response to [DOSL]'s Objections to Plaintiffs' Initial Trial Plan, pp. 1 and 3, Docket Entry No. 193,
(continued...)

that to the extent the testimony of these witnesses will elicit information regarding their own alleged experiences with DOSL, including their discharge from different rigs at different times, that testimony is irrelevant and prejudicial.[34] At Docket Call held on October 8, 2021, the court granted DOSL's request to exclude this "me-too" evidence "as to the claims of Thompson and Thomas to the extent that they are prohibited from testifying about their own claims, which were dismissed, and . . . limit[ed] the testimony of other SDRS called to testify, except to the extent that they have personal knowledge [of Plaintiffs' individual experiences]."[35] The court also granted DOSL's request to exclude any references to complaints or claims made by Douglas Tyrone May as irrelevant and prejudicial because he worked for Diamond Offshore Management Company, a separate entity from DOSL.[36]

---

[33](...continued)
pp. 2 and 10 (listing as witness the other African-American SDRs alleged to be similarly situated and, therefore, proper comparators, to Plaintiffs).

[34]Defendant's Memorandum in Support of Motion in Limine, Docket Entry No. 161-1, p. 25 ¶ XVI.

[35]Id. at 24; and Transcript of October 8, 2021, Docket Call, Docket Entry No. 181, p. 4:15-21.

[36]See Defendant's Memorandum in Support of Its Motion in Limine, Docket Entry No. 161-1, pp. 27-28 ¶ XXII; and Transcript of October 8, 2021, Docket Call, Docket Entry No. 181, p. 4:25.  See also [DOSL]' Final Trial Plan Objections to Plaintiffs' Initial Trial Plan, Docket Entry No. 192, pp. 1-2 (objecting to the testimony of former employees who did not work together with Plaintiffs or lack personal knowledge of Plaintiffs' discharges).

Plaintiffs may present "me-too" evidence only if they first establish a requisite predicate by showing that their witnesses are similarly situated to the Plaintiffs.  See Wyvill v. United Companies Life Insurance Co., 212 F.3d 296 (5th Cir. 2000), cert. denied, 121 S. Ct. 1081 (2001).  Wyvill was an age discrimination case in which the Fifth Circuit reversed a jury verdict for two plaintiffs on their disparate treatment claims based in improperly admitted evidence from individuals who were not proper comparators. Citing Mooney v. Aramco Services Co., 54 F.3d 1207, 1221 (5th Cir. 1995), the Fifth Circuit explained that

> [t]his court and others have held that testimony from former employees who had different supervisors than the plaintiff, who worked in different parts of the employer's company, or whose terminations were removed in time from the plaintiff's termination cannot be probative of whether age was a determinative factor in the plaintiff's discharge.

Wyvill, 212 F.3d at 302.  If, however, Plaintiffs are able to present evidence proving that other discharged African-American SDRs are similarly situated to Plaintiffs, then they are proper comparators whose "me-too" testimony is admissible as it would be probative of whether an unlawful motive was a factor in the Plaintiffs' discharge.[37]  See Alaniz v. Zamora-Quezada, 591 F.3d 761, 774-75 (5th Cir. 2009) (District Court did not err in allowing non-party employees to testify about the employer's alleged sex discrimination against them because such testimony was relevant to the plaintiffs proving the employer's discriminatory acts reflected

_____

[37]See Defendant's Memorandum in Support of Its Motion in Limine, Docket Entry No. 161-1, p. 23.

a "plan, motive, knowledge, and absence of mistake or accident.");
Hitt v. Connell, 301 F.3d 240, 249-50 (5th Cir. 2002) (District
Court did not err in allowing non-party employees to testify about
the employer's discrimination and retaliation against them because
such testimony was relevant to the plaintiff proving the employer's
motive in discharging him).

4.   Plaintiffs May Present Statistical Evidence, Including
     Expert Evidence, Only If They Present Other Evidence of
     Racially Discriminatory Disparate Treatment

Asserting that DOSL discharged one-hundred percent of its
African-American SDRs, and discharged only 26% of its white SDRs,
despite white SDRs comprising 66% of the SDR workforce,[38] Plaintiffs
contend that "[t]his gross racial statistical disparity is no
accident: it resulted from [DOSL]'s top Safety and Human Resources'
officials' disparate treatment of its African-American SDRs."[39]
Plaintiffs contend that "[o]ther trial evidence will confirm that
this gross racial statistical disparity was not the result of
random chance but, rather, was caused by [DOSL]'s disparate
treatment of the African-American SDR[]s,"[40] and that other evidence
will establish that

- During the RIF, [DOSL] preserved the employment of
  numerous white SDR[]s by paying their salaries

---

[38]Plaintiffs' Trial Memorandum, Docket Entry No. 167, pp. 1-2.

[39]Id. at 2.

[40]Id.

through various off-rig ("extra") payroll accounts. [DOSL] did not assign any African-American SDR to such "extra" accounts during the RIF[;]

- During the RIF, [DOSL] preserved the employment of numerous white SDR[]s by re-assigning them and "bumping" (i.e. terminating or otherwise removing from rigs) SDR[]s with less tenure and/or lower performance assessment scores. [DOSL] failed to "bump" in favor of any of the six African-American SDR[]s[; and]

- During the RIF, [DOSL] re-assigned white SDR[]s to non-SDR positions in order to preserve their employment. [DOSL] failed to re-assign any African-American SDR to non-SDR positions.[41]

Citing Federal Rules of Evidence 401,[42] 402,[43] and 403,[44] and EEOC v. Texas Instruments, Inc., 100 F.3d 1173, 1185-86 (5th Cir. 1996), DOSL argues that "Plaintiffs should not be permitted to present statistical evidence to support their disparate treatment

---

[41]Id. at 5-6.

[42]Rule 401 states that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."

[43]Rule 402 states that "[r]elevant evidence is admissible unless [the Constitution, a federal statute, the Federal Rules of Evidence, or a rule prescribed by the Supreme Court] provides otherwise."

[44]Rule 403 serves as an exception to the admissibility of relevant evidence.  It states that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  "A district court 'has broad discretion to weigh the relevance, probative value, and prejudice of the evidence in determining its admissibility under Rule 403.'"  French v. Allstate Indemnity Co., 637 F.3d 571, 578 (5th Cir.), cert. denied, 132 S. Ct. 420 (2011) (citation omitted).

claims."[45]  Acknowledging that "statistical evidence may in certain unusual cases be used to bolster an individual claim of disparate treatment,"[46] DOSL argues that "[t]his is not the unusual case of disparate treatment where statistical evidence should be allowed."[47] DOSL argues that Plaintiffs' statistical evidence should be excluded for purposes of establishing their disparate treatment claims because

> [n]either Plaintiff has any evidence of race discrimination other than the (inadmissible) raw statistics or what they intend to offer or characterize as statistical evidence.  Without more, they cannot use such numbers, even in the form of proper statistical analysis, to support their disparate treatment claims. Plaintiffs have never alleged, identified, or disclosed in discovery any evidence whatsoever of disparate treatment based on race other than their observations about raw numbers or what they present as "statistical" evidence.  Therefore, Plaintiffs should be precluded from using such "statistics" when there is no other evidence that they are bolstering. . .[48]

(a)  Statistical Evidence is Permissible If Accompanied by Other Evidence of Disparate Treatment

In Plemer v. Parsons-Gilbane, 713 F.2d 1127, 1137 (5th Cir. 1983), the Fifth Circuit held that "[a]n employee may use statistics to show that an employer's justification for a

---

[45]Defendant's Memorandum in Support of Its Motion in Limine, Docket Entry No. 161-1, p. 17.

[46]Id.

[47]Id.

[48]Id. at 18.

discriminatory act is pretext." See also McDonnell Douglas, 93 S. Ct. at 1825-26 (including statistics in list of evidence available to plaintiff to show pretext). The Fifth Circuit has stated that

> gross statistical disparities resulting from a reduction in force or similar evidence may be probative of discriminatory intent, motive or purpose. Such statistics might in an unusual case provide adequate circumstantial evidence that an individual employee was discharged as part of a larger pattern of layoffs targeting older employees. This is not to say that such statistics are enough to rebut a valid, nondiscriminatory reason for discharging a particular employee. Generally, they are not, because under the McDonnell Douglas Title VII framework, a judge and now perhaps, a jury would have to consider not just the employee's prima facie case, but also the employer's articulated nondiscriminatory reason for its conduct with respect to the employee. The employee would then be attempting to prove the employer's reason was a pretext; proof of pretext, hence of discriminatory intent, by statistics alone would be a challenging endeavor.

Walther v. Lone Star Gas Co., 977 F.2d 161, 162 (5th Cir. 1992) (per curiam). "While Walther explains that generalized statistical evidence will rarely rebut a particularized nondiscriminatory rationale, statistical evidence may be probative of pretext in limited circumstances," Texas Instruments, 100 F.3d at 1185, and "[t]he probative value of statistical evidence ultimately depends on all the surrounding facts, circumstances, and other evidence of discrimination." Id. (citing International Brotherhood of Teamsters v. United States, 97 S. Ct. 1843, 1856-57 (1977)). In Texas Instruments the Fifth Circuit explained that statistical evidence is only probative of intent when combined with other

-31-

evidence specifically rebutting the defendant's legitimate, nondiscriminatory reasons. Id. ("Because the EEOC's statistics do not even purport to analyze the facts concerning individual supervisors, the statistics are impotent, without more, to rebut [defendant's] particularized reasons for the termination of the Six Supervisors."). See also Deloach v. Delchamps, Inc., 897 F.2d 815, 820 (5th Cir. 1990) (statistical evidence is probative only when coupled with other evidence contradicting employer's legitimate, non-discriminatory reasons of the adverse action). Thus, if as Plaintiffs contend, they can present evidence other than statistics, from which a reasonable jury could infer that DOSL intentionally discriminated against them because of their race by subjecting them to disparate treatment, Plaintiffs may use statistical evidence to rebut DOSL's non-discriminatory reasons for their discharge.

(b)   Plaintiffs May Present Expert Evidence of Statistics

Asserting that "Dr. N. Shirlene Pearson — the former Director of S[outhern] M[ethodist] U[niversity]'s Center for Statistical Consulting and Research and a recognized statistical expert — has analyzed DOSL's SDR RIF data — data that [**DOSL**] created and tendered to the Plaintiffs in discovery,"[49] Plaintiffs contend that

> Dr. Pearson will testify that this data reflects an overwhelming statistical correlation between [DOSL]'s

---

[49]Plaintiffs' Trial Memorandum, Docket Entry No. 167, pp. 3-4.

SDR's race and his/her termination during the RIF. Specifically, Dr. Pearson will testify that, under the peer-reviewed "Fisher Exact Test," the likelihood that [DOSL]'s gaping Black/White SDR RIF disparity is the result of random chance — rather than race discrimination is **.2%**.[50]

DOSL argues that

[f]or the reasons set forth in Defendant's Motion to Exclude Expert Report and Testimony of Plaintiffs' Proposed Expert, N. Shirlene Pearson, Ph.D. ®. Docs. 143, 150), Plaintiffs' expert should not be permitted to testify in this case regarding her statistical analysis because it is irrelevant, unreliable, and inadmissible.[51]

Citing Federal Rule of Evidence 702, and the Supreme Court's decision in Daubert v. Merrell Dow Pharmaceuticals, Inc., 113 S. Ct. 2786 (1993), DOSL contends that

Dr. Pearson's analysis is . . . fundamentally flawed because it lacks sufficient or accurate facts or data, is not the product of reliable principles and methods, and is not the result of reliable application of principles and methods to the facts of the case.[52]

Rule 702 allows expert testimony to be admitted that assists the trier of fact to understand the evidence or determine a fact in issue.  Rule 702 states that

[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

---

[50]Id. at 4.

[51]Defendant's Defendant's Memorandum in Support of Its Motion in Limine, Docket Entry No. 161-1, p. 21.

[52]DOSL's Motion to Exclude, Docket Entry No. 143, pp. 5, 10.

(b)   the testimony is based on sufficient facts or data;

(c)   the testimony is the product of reliable principles and methods; and

(d)   the expert has reliably applied the principles and methods to the facts of the case.

When asked to do so, a district court must make a preliminary determination as to whether the requirements of Rule 702 are satisfied with respect to a particular expert's proposed testimony. See Daubert, 113 S. Ct. at 2796 (citing Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, . . . or evidence is admissible."). Courts act as gatekeepers of expert testimony "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co., Ltd. v. Carmichael, 119 S. Ct. 1167, 1176 (1999). The party offering the expert's testimony bears the burden of proving by a preponderance of the evidence that: (1) the expert is qualified; (2) the testimony is relevant to an issue in the case; and (3) the testimony is reliable. Daubert, 113 S. Ct. at 2794. See also Pipitone v. Biomatrix, Inc., 288 F.3d 239, 244 (5th Cir. 2002) ("[E]xpert testimony is admissible only if it is both relevant and reliable.").

To be qualified an expert "witness must have such knowledge or experience in [his] field or calling as to make it appear that his

-34-

opinion or inference will probably aid the trier in his search for truth." United States v. Hicks, 389 F.3d 514, 524 (5th Cir. 2004), cert. denied, 126 S. Ct. 1022 (2006) (quoting United States v. Bourgeois, 950 F.2d 980, 987 (5th Cir. 1992)).  To be relevant the reasoning or methodology underlying the expert's testimony must be applicable to the facts in issue.  See Curtis v. M&S Petroleum, Inc., 174 F.3d 661, 668 (5th Cir. 1999) (citing Daubert, 113 S. Ct. at 2796).  To be reliable the reasoning or methodology underlying the expert's testimony must be scientifically valid.  Id.  "The proponent need not prove to the judge that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable." Moore v. Ashland Chemical, Inc., 151 F.3d 269, 276 (5th Cir. 1998) (en banc), cert. denied, 119 S. Ct. 1454 (1999).  See also Guy v. Crown Equipment Corp., 394 F.3d 320, 325 (5th Cir. 2004) ("Although the Daubert analysis is applied to ensure expert witnesses have employed reliable principles and methods in reaching their conclusions, the test does not judge the expert's conclusions themselves.").

The Fifth Circuit has recognized that Daubert articulated a non-exclusive, list of flexible criteria for determining reliability, including:

> (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community.

Moore, 151 F.3d at 275 (citing Daubert, 113 S. Ct. at 2796-97).

Not all of the factors will necessarily apply to every expert's testimony.  See Watkins v. Telsmith, Inc., 121 F.3d 984, 990-91 (5th Cir. 1997).  The court should first decide whether the factors mentioned in Daubert apply, and then consider whether other factors not mentioned in Daubert are relevant to the case.  See Black v. Food Lion, Inc., 171 F.3d 308, 310-12 (5th Cir. 1999).

### (1)  Dr. Pearson is Qualified

DOSL does not challenge Dr. Pearson's qualifications, training, or experience to provide statistical evidence stemming from its decision to discharge the Plaintiffs.  The curriculum vitae attached as Exhibit 1 to her report shows that she has worked as a professional statistician in both industry and academia for over 40 years, that she has authored or contributed to numerous reports and articles, and that she has previously served as an expert witness.[53]

### (2)  Dr. Pearson's Evidence is Relevant and Reliable

"[E]xpert testimony is admissible only if it is both relevant and reliable."  Pipitone, 288 F.3d at 244.  DOSL argues that

---

[53]See Plaintiffs' Response to Diamond Offshore Services Limited's Motion to Exclude Report and Testimony of N. Shirlene Pearson, Ph.D. ("Response to DOSL's Motion to Exclude"), Docket Entry No. 145, pp. 16-17 (citing Exhibits 1 and 2 to Amended Report of N. Shirlene Pearson, Ph.D., Docket Entry No. 145-1, pp. 8-13).

Dr. Pearson's statistical evidence is neither relevant nor reliable and thus, inadmissible, because it is based on unsubstantiated assertions and insufficient and erroneous data, and because it fails to properly apply a scientifically valid methodology to the facts of the case. DOSL argues that Dr. Pearson's evidence is unreliable because her analysis hinges on the "one RIF fallacy" based not on data and documents provided to her but, instead, on a representation from Plaintiffs' counsel. DOSL argues that Dr. Pearson's statistical evidence is irrelevant because she makes the methodological mistake of treating all SDRs as equally at risk of RIF irrespective of relevant facts, and she improperly analyzes the data as if there was a single RIF during a time period selected by Plaintiffs' counsel that biases her results.[54]  Citing Dr. Pearson's deposition testimony, DOSL argues that

> [a]lthough the evidence demonstrates that there were numerous RIFs conducted at [DOSL] over at least a five-year period, contrary to the "one RIF" fallacy on which Dr. Pearson relied and which is outside her own experience as an expert, Dr. Pearson did not structure her analysis by pooling or grouping data by rig or by RIF, and does not know whether the results of her analysis would have been different had she done so.[55]

Citing the report that Dr. Pearson filed in <u>Davis v. City of Dallas</u>, No. 308-CV-1123-B, 2009 WL 8584568 (N.D. Tex. July 28, 2009), on behalf of the defendant, in which she criticized the plaintiff's expert for "lack of analysis that takes into account

---

[54]DOSL's Motion to Exclude, Docket Entry No. 143, pp. 13-21.

[55]<u>Id.</u> at 17.

that four different appraisal instruments were used" as part of an employee appraisal process, DOSL argues that

> [i]n Davis, unlike here, she performed an analysis on subgroups or pools of data that accounted for relevant factual differences to correct the opposing expert's analysis that she found lacking.  In fact, that approach is analogous to that Donald R. Deere, Ph.D., [DOSL]'s statistical expert, notes she should have used in this case, showing that her contrary analysis is unreliable and irrelevant.[56]

DOSL notes that

> Dr. Deere corrects Dr. Pearson's data errors and methodological failure to account for assigned rigs and RIF dates, noting that (1) there are 48 RIFs of SDRs in the data used by Dr. Pearson as corrected; (2) the "multiple pools approach is analogous to the Mantel Haenszel approach used by Dr. Pearson in her prior report" in Davis, and that (3) under this approach "there is not a statistically significant difference between the actual RIFs of African-American [SDRs] and the RIFs expected form a race-neutral process."[57]

Although "expert testimony that relies on 'completely unsubstantiated factual assertions' is inadmissible," Moore v. International Paint, L.L.C., 547 F. App'x 513, 515 (5th Cir. 2013) (per curiam), for the reasons stated in § III.B.1-2, above, the court has already concluded that whether the Plaintiffs and the four other discharged African-American SDRS were discharged during a single, continuing RIF, as Plaintiffs argue, or whether they were discharged in as many as 48 separate RIFs, as DOSL argues, and whether Plaintiffs are similarly situated to other SDRs who were

---

[56]Id. at 19.

[57]Id. n. 10 (quoting Expert Report of Donald R. Deere, Ph.D., Exhibit K to DOSL's Motion to Exclude, Docket Entry No. 143-11).

not discharged, are contested issues of law and fact. If the evidence presented at trial proves that Plaintiffs and the four other African-American SDRs were all discharged in a single, continuing RIF, and that Plaintiffs are similarly situated to white SDRs who were not discharged, then Dr. Pearson's evidence, which treats all SDRs as equally at risk during a single, continuing RIF, would be relevant, reliable, and admissible.

Moreover, DOSL's argument that Dr. Pearson's evidence is irrelevant and unreliable because it failed to pool or group data by rig or by the multiple RIFs that DOSL contends occurred does not challenge Dr. Pearson's calculations or methodology, i.e., her use of the "Fisher Exact Test" to determine whether there is a statistically significant difference in DOSL's treatment of African American SDRs. Instead, DOSL's argument challenges the basis of Dr. Pearson's opinions and the variables used in her calculations. If Dr. Pearson missed important facts or variables, that oversight can be addressed during cross-examination, and as such, goes to the weight — not to the admissibility — of her opinions. See Puga v. RCX Solutions, Inc., 922 F.3d 285, 294 (5th Cir. 2019) ("As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility.")(citing Rock v. Arkansas, 107 S. Ct. 2704, 2714 (1987)). If Plaintiffs present evidence other than statistics to prove their disparate treatment claim, then Plaintiffs will be allowed to present Dr. Pearson's statistical

evidence to the jury because the reasoning and methodology underlying it are both applicable to the facts in issue, and scientifically valid. See Curtis, 174 F.3d at 668 (citing Daubert, 113 S. Ct. at 2796). See also Puga, 922 F.3d at 294 ("Particularly in a jury trial setting, the court's role under Rule 702 is not to weigh the expert testimony to the point of supplanting the jury's fact-finding role — the court's role is limited to ensuring that the evidence in dispute is at least sufficiently reliable and relevant to the issue so that it is appropriate for the jury's consideration.").

### 5. Plaintiffs' May Not Present Pattern-and-Practice Evidence

DOSL has long argued that Plaintiffs cannot assert a pattern-or-practice claim arising from their discharges in a RIF under the circumstances at issue in this case.[58]   A "pattern or practice" claim is not a separate and distinct cause of action under Title VII, but is another method of proving disparate treatment.   See Mooney, 54 F.3d at 1219.   The pattern and practice mode of proof for race discrimination claims was recognized in Teamsters, 97 S. Ct. at 1866-67.   The pattern or practice mode of proof requires

---

[58]See Defendants' Motion to Strike Plaintiff's Ostensible First and Second Amended Complaints, and Authorities in Support, Docket Entry No. 26, pp. 2, and 5-7 (arguing that it would be futile to allow leave to amend to add, inter alia, a purported new pattern or practice claim because the pattern-or-practice method of proving discrimination is not available in a private, non-class action); Defendants' Opposition to Plaintiffs' First Motion to Compel, Docket Entry No. 29, p. 7 n. 6; Defendant's Memorandum in Support of Its Motion in Limine, Docket Entry No. 161-1, pp. 21-22 ¶ XIV.

establishing "by a preponderance of the evidence that racial discrimination was the company's standard operating procedure [—] the regular rather than the unusual practice." Id. 1855.

While neither the Supreme Court nor the Fifth Circuit has explicitly stated that the pattern and practice method of proof may never be used in private, non-class suits, other courts have reached this conclusion. See Celestine v. Petroleos de Venezuella SA, 266 F.3d 343, 355-56 (5th Cir. 2001)(citing cases). Moreover, in Celestine the Fifth Circuit held that

> [g]iven the nature and purpose of the pattern and practice method of proof, this Court's precedents, and the precedents of other circuits, the district court did not err in refusing to the apply the Teamsters method of proof as an independent method of proof to the appellants' individual claims in lieu of the McDonnell Douglas method at the summary judgment stage.

Id. at 356. See also Scarlett v. Seaboard Coast Line Railroad Co., 676 F.2d 1043, 1053 (5th Cir. 1982)(recognizing Teamsters framework as applicable in "'pattern and practice' suit[s] by the government," and in "private class action[s]"); Rogers v. Pearland Independent School District, 827 F.3d 403, 408 (5th Cir. 2016), cert. denied, 137 S. Ct. 820 (2017) (observing that "the pattern-or-practice method of proving discrimination is unavailable in private, non-class action"). Because this is neither a government action nor a class action but, instead, a private action in which Plaintiffs assert only their own individual claims of race discrimination, Plaintiffs may not present evidence or argument that DOSL engaged in a pattern-or-practice of race discrimination.

## IV.  <u>Timing Order</u>

The court has considered the estimated time for trial.  The parties have previously estimated that the entire jury trial would require approximately nine to ten days.  Plaintiffs now estimate 40.00 hours of court time for their portion of the case,[59] and Defendant now estimates 35.6 hours of court time for its portion of the case.[60]  The parties' estimates, especially those of Plaintiffs' counsel, are not reasonable.  Based on the court's evaluation of the case and the estimates provided by counsel, Plaintiffs will be allocated a total of 15 hours of evidence, and Defendant will be allocated a total of 15 hours of evidence.  Because the court's familiarity with the case indicates that these time allocations are liberal, they will be reduced if the court perceives counsel to be wasting court time.

## V.  <u>Conclusions and Order</u>

For the reasons stated in § II, above, there will be no trial on Pickney's disparate impact claim because Pickney failed to exhaust administrative remedies for that claim.  Accordingly, Pickney's disparate impact claim is **DISMISSED WITHOUT PREJUDICE.**

---

[59]<u>See</u> Plaintiffs' Final Trial Plan; Objections to Diamond's Final Trial Plan; and Response to Diamond's Objections to Plaintiffs' Initial Trial Plan, Docket Entry No. 193, p. 6.

[60]<u>See</u> Defendant Diamond Offshore Services Limited's Final Trial Plan & Objection to Plaintiffs' Initial Trial Plan, Docket Entry No. 192, pp. 3 and 6.

For the reasons stated in § III, above, the court **ORDERS** that

- Plaintiffs may present evidence intended to prove they were discharged in a single, continuing RIF;

- Plaintiffs may present evidence intended to prove they are similarly situated to DOSL's other SDRs;

- Plaintiffs may present "me-too" evidence only if they first prove that they are similarly situated to their "me-too" witnesses;

- Plaintiffs may present statistical evidence, including expert evidence, only if they first present other evidence of racially discriminatory disparate treatment;

- Plaintiffs may not present evidence or argument that DOSL engaged in a pattern-and-practice of race discrimination.

For the reasons stated in § IV, above, the court hereby **ORDERS** that the parties be allocated the following time:

- Plaintiffs are allocated a total of 15 hours of evidence;

- Defendant is allocated a total of 15 hours of evidence.

The court will rule on the admissibility of exhibits when they are offered into evidence at trial.

Jury selection will begin on April 4, 2022, at 1:00 p.m. in Courtroom 9B, Federal Courthouse, 515 Rusk Street, Houston, Texas.

-43-

Jury questionnaires will be available in the courtroom at 12:00 noon for review by counsel.

The court will voir dire the jury panel. Counsel for the Plaintiffs will be allowed ten (10) minutes for additional questions to the jury panel; and counsel for the Defendant will be allowed ten (10) minutes for additional questions to the jury panel. The parties may submit proposed questions for the jury panel.

Counsel for the Plaintiffs will be allowed ten (10) minutes for opening statement; and counsel for the Defendant will be allowed ten (10) minutes for opening statement.

Plaintiffs should be prepared to call witnesses on the afternoon of April 4, 2022.

The court will not revisit any of the rulings in this Memorandum Opinion and Order before trial.

**SIGNED** at Houston, Texas, on this 25th day of March, 2022.

_____
SIM LAKE
SENIOR UNITED STATES DISTRICT JUDGE

-44-